1
2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

3
4
5
6
7
8
9
10
11
12

| | |
|---|---|
| ERICA MIKULSKY, individually and on behalf of all others similarly situated, | Case No. 23-CV-425-L-BGS |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | **FIRST AMENDED AND RESTATED COMPLAINT – CLASS ACTION** |
| BLOOMINGDALE'S, LLC and BLOOMINGDALES.COM, LLC, | |
| Defendants. | |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff, Erica Mikulsky ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this First Amended and Restated Complaint – Class Action ("FARC") against Defendants Bloomingdale's, LLC and Bloomingdales.com, LLC (collectively "Defendants" or "Bloomingdale's"), and in support thereof alleges the following:

## INTRODUCTION

1.     This is a class action brought against Bloomingdale's for wiretapping the electronic communications of visitors to Bloomingdale's website, www.bloomingdales.com. Bloomingdale's procures third-party vendors, such as FullStory, to embed snippets of JavaScript computer code ("Session Replay Code") on Bloomingdale's website, which then deploys on each website visitor's internet browser for the purpose of intercepting and recording the website visitor's electronic communications with the Bloomingdale's website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications").  These third-party vendors (collectively, "Session Replay Providers") create and deploy the Session Replay Code at Bloomingdale's request.

2.     After intercepting and capturing the Website Communications, Bloomingdale's and the Session Replay Providers use the Website Communications to recreate website visitors' entire visits to www.bloomingdales.com. The Session Replay Providers create a video replay of each visitor's behavior on the website and provide it to Bloomingdale's for analysis. Bloomingdale's procurement of the Session Replay Providers to secretly deploy the Session Replay Code results in the electronic equivalent of a stranger "looking over the shoulder" of each visitor to the Bloomingdale's website for the entire duration of their website interaction.

3.      Bloomingdale's conduct violates the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*. and constitutes the torts of invasion of the privacy rights and intrusion upon seclusion of website visitors.

4.     Plaintiff brings this action individually and on behalf of a class of all persons in California whose Website Communications were intercepted through Bloomingdale's procurement and use of Session Replay Code embedded on the webpages of www.bloomingdales.com and seeks

all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## PARTIES

5.　　Plaintiff, Erica Mikulsky, is a citizen of the State of California, and at all times relevant to this action, resided and was domiciled in San Diego County, California.

6.　　Defendant Bloomingdale's, LLC is a limited liability company formed under the laws of Ohio, with its principal place of business located at 2807 Jackson Avenue, Long Island City, New York. Bloomingdale's, LLC is a citizen of New York.

7.　　Defendant Bloomingdales.com, LLC is a limited liability company formed under the laws of Ohio, with its principal place of business located at 2807 Jackson Avenue, Long Island City, New York. Bloomingdales.com, LLC is a citizen of New York.

## JURISDICTION AND VENUE

8.　　This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than Defendants.

9.　　This Court has personal jurisdiction over Defendants because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in California.  Further, Defendants purposefully directed their activities to California, consummated transactions in California, and purposefully availed themselves of the privilege of conducting activities in California thereby invoking the benefits and protections of California law. Specifically, Plaintiff, while in California, accessed and viewed the www.bloomingdales.com website, both to view merchandise subsequently purchased from brick-and-mortar Bloomingdale's stores and to make purchases of merchandise completely online.

10.　　The privacy violations complained of herein resulted from Defendants' purposeful and tortious acts directed towards citizens of California while those citizens were located within California. At all relevant times, Defendants knew their practices directly resulted in the collection of

information from California citizens while those citizens browsed and made purchases on www.bloomingdales.com. Defendants chose to avail themselves of the business opportunities of marketing and selling their goods in California and, in so doing, collected – directly or through the use of an undisclosed third-party Session Replay Provider - real-time data from website sessions initiated by Plaintiff while located in California, and the claims alleged herein arise from those activities.

11. Bloomingdale's also knows that many users visit and interact with the Bloomingdale's website while they are physically present in California. Both desktop and mobile versions of Bloomingdale's website allow users to search for nearby stores in California and provide directions to these stores based on the user's location. Further, Bloomingdale's website permits visitors, including those in California, to book appointments through Bloomingdale's website with representatives at Bloomingdale's brick-and-mortar stores in California. Bloomingdale's offering of such location services means that Bloomingdale's is aware its website is visited by people located in California, and that these California website visitors are being wiretapped in violation of California statutory and common law.

12. In addition to the ability to use its website to funnel California customers to Bloomingdale's California stores, Bloomingdale's website is further integrated with the operations of its brick-and-mortar stores in California, by offering numerous unified services, including, as noted above: (1) on-line booking of appointments at brick-and-mortar Bloomingdale's stores, including those stores located in California; (2) enabling customers to purchase goods via the website for pick-up at Bloomingdale's brick-and-mortar store(s), including those stores located in California; (3) advertising opportunities to enable customers to view and/or participate in in-store events through Bloomingdale's website ("Our in-store events have gone virtual! Mark your calendar for upcoming events and check out our records of past demos, discussions and styling sessions with some of our favorite designers and tastemakers"[1]); (4) offering appointments with stylists for both on-line and in-

---

[1] *See, e.g.*, https://www.bloomingdales.com/c/editorial/onscreen/holiday-sneak-peek-with-charlotte-tilbury/.

store consultations; and (5) other integrated operations.[2] As a result of this integration, Bloomingdale's website acts as a conduit to additional sales and services available in its 16 brick-and-mortar stores in California.[3] Stated another way, Bloomingdale's website operations and its operation of the brick-and-mortar stores in California constitute an integrated single business operating in the State of California.

13.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Website User and Usage Data Have Immense Economic Value.

14.     The "world's most valuable resource is no longer oil, but data."[4]

15.     Earlier this year, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[5] This information is valuable to companies because they use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[6]

---

[2] https://www.bloomingdales.com/?cm_mmc=google-_-Brand+Terms+-+Not+Main+kw-_-Brand+Terms+-+Non+Main+Kw-_-s_bloomindales_e_478033922543-_-go_cmp-11564742405_adg-109570288061_ad-478033922543_aud-179496473104:kwd-115158184_dev-c_ext-_sig-CjwKCAjwvrOpBhBdEiwAR58-3J_FUq5VHspHS3ca3HcM4wt3xfLyFtSHxE2nPEjMuzCQm8fbtrOrYBoCShIQAvD_BwE&gclid=CjwKCAjwvrOpBhBdEiwAR58-3J_FUq5VHspHS3ca3HcM4wt3xfLyFtSHxE2nPEjMuzCQm8fbtrOrYBoCShIQAvD_BwE

[3] *See* https://locations.bloomingdales.com/index.html. .

[4] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.

[5] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, Business News Daily (Aug. 5, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[6] *Id.*

16.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[7]

17.     In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[8] In this paper, the OECD measured prices demanded by companies for user data derived from "various online data warehouses."[9]

18.     The OECD indicated, "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[10]

**B.      Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

19.     Consumers are skeptical and wary about their personal data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[11]

20.     Another recent paper indicates most website visitors will assume their detailed interactions with a website will only be used by the website and not shared with a party they know

---

[7] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[8] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[9] *Id.* at 25.

[10] *Id.*

[11] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

nothing about.[12] As such, website visitors reasonably expect their interactions with a website should not be released to third parties unless explicitly stated.[13]

21.     Privacy polls and studies show a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

22.     A recent study by Consumer Reports shows that 92 percent of Americans believe internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[14]

23.     Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79 percent, are concerned about how data is collected about them by companies.[15]

24.     Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[16]

### C.     How Session Replay Code Works.

25.     Session Replay Code, such as that implemented on www.bloomingdales.com, enables Session Replay Providers to record, save, and replay website visitors' interactions with a given website. The clandestinely deployed code provides online marketers and website designers with

---

[12] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.
[13] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).
[14] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.
[15] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.
[16] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

insights into the user experience by recording website visitors, such as Plaintiff and the class "as they click, scroll, type or navigate across different web pages."[17]

26.     Session Replay Code goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites, intercepting not only the "where" and "when" data (often referred to as "record data") but also the "what" (the content of the communications). Unlike other online advertising tools, Session Replay Code captures and records nearly every action a website visitor takes while on the website, including actions that reveal the visitor's personal or private sensitive data, even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[18] As a result, website visitors "aren't just sharing data with the [web]site they're on . . . but also with an analytics service that may be watching over their shoulder."[19]

27.     Session Replay Code works by inserting computer code into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser, the browser will follow the code's instructions by sending responses in the form of "event" data to a designated third-party server. Typically, the server receiving the event data is controlled by the third-party entity that wrote the Session Replay Code, rather than the owner of the website where the code is installed.  The presence of the Session Replay Provider is not made known to or consented to by the website user and thereby renders this type of data collection improper, if not illegal.

28.     The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and encompass virtually every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website. To permit a reconstruction of a user's visit accurately, the Session Replay Code captures these events at hyper-frequent intervals,

---

[17] Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.
[18] *Id.*
[19] Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

often just milliseconds apart. Events are accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is finished.

29.     Unless specifically masked through configurations chosen by the website owner, some visible contents of the website are also transmitted to the Session Replay Provider.  Regardless of configuration, Website users have no way of knowing the extent to which their interactions with a website, such as www.bloomingdales.com, are captured, stored, shared, sold, or otherwise used.

30.     As the events from a user session are recorded by a Session Replay Code, a website operator is later able to view a visual reenactment of the user's visit through the Session Replay Provider, usually in the form of a video, meaning "[u]nlike typical analytics services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[20]  Again, the session which is shared with the website owner, such as bloomingdale's.com, created the content without the consent or knowledge of the website user, Plaintiff here, even if they knew they were being monitored, or, if they did, certainly did not know such monitoring was being carried out by an unknown and (to them) uninvited spectator acting with the knowledge and consent solely of the website owner.

31.     Because most Session Replay Codes will by default indiscriminately capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information is captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[21]  Unless and until Plaintiff can conduct discovery in this case, it is not possible to allege, with particularity, the information captured and shared by the Session replay provider. However, the content is not the important consideration.  The important consideration is the presence of an uninvited third-party which, in real time and without Plaintiff's consent, is capturing Plaintiff's actions on the www.bloomingdales.com website and providing that information to bloomingdales.com without the knowledge or consent of the Plaintiff.

---

[20] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[21] *Id.*

32.     Most alarming, Session Replay Code captures data the user may not even intentionally transmit to a website during a visit, and then makes that data available to website owners when they access the session replay through the Session Replay Provider. For example, if a user writes information into a text form field, but then chooses not to click a "submit" or "enter" button on the website, the Session Replay Code may nevertheless cause the non-submitted text to be sent to the designated event-response-receiving server before the user deletes the text or leaves the page. This information will then be viewable to the website owner when accessing the session replay through the Session Replay Provider.

33.     Session Replay Code does not necessarily anonymize user sessions, either.

34.     First, if a user's entry of personally identifying information is captured in an event response, that data will become known and visible to both the Session Replay Provider and the website owner.

35.     Second, if a website displays user account information to a logged-in user, that content may be captured by Session Replay Code.

36.     Third, some Session Replay Providers explicitly offer website owners functionality that permits linking a session to an identified user, who will be personally identified if the website owner has associated the user with an email address or username.[22]

37.     Session Replay Providers create "fingerprints" that are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. The resulting fingerprint, which is unique to a user and rarely changes, is collected across all sites that the Session Replay Provider monitors.

38.     When a user eventually identifies themselves to one of these websites (such as by filling in a form), the provider can then associate the "fingerprint" with the user identity and can then back-reference all of that user's other web browsing across other websites previously visited, including on websites where the user had intended to remain anonymous—even if the user explicitly indicated that they intended to remain anonymous by enabling private browsing.  The ability to create

---

[22] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113, (last visited Sep. 8, 2022).

a "fingerprint" of an otherwise anonymous user provides the website owners with the ability to target customers with advertising based on their website browsing habits, creating a marketing plan aimed at customers and based solely on their browsing across multiple websites and despite the fact that the customers specifically indicated an intent to remain anonymous to many of the websites then able to target them.

39.     In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[23] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected [] it may not be stored properly or have standard protections" increasing "the overall risk that data will someday publicly leak or be breached."[24]

40.     The privacy concerns arising from Session Replay Code are not theoretical or imagined. The CEO and founder of LOKKER, a provider of data privacy and compliance solutions has said "[consumers] should be concerned" about the use of Session Replay Code because "they won't know these tools are operating 'behind the scenes' of their site visit" and "even if the company disclosed that they are using these tools, consumers wouldn't likely be able to opt-out and still use the site."[25]

41.     Indeed, the news is replete with examples of the dangers of Session Replay Code. For example, in 2019, the App Analyst, a mobile expert who writes about his analyses of popular apps, found that Air Canada's iPhone app wasn't properly masking the session replays they were sent,

---

[23] Juha Sarrinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.
[24] Lily Hay Newman, *Covert 'Replay Sessions' Have Been harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.
[25] Mark Huffner, *Is 'session replay software' a privacy threat or just improving your web experience*, Consumer Affairs (Oct. 25, 2022), https://www.consumeraffairs.com/news/is-session-replay-software-a-privacy-threat-or-just-improving-your-web-experience-102522.html.

exposing unencrypted credit card data and password information.[26] This discovery was made just weeks after Air Canada said its app had a data breach, exposing 20,000 profiles.[27]

42.     Further, multiple companies removed Session Replay Code from their websites after it was discovered the Session Replay Code captured highly sensitive information. For instance, in 2017, Walgreens stopped sharing data with a Session Replay Provider after it was discovered that the Session Replay provider gained access to website visitors' sensitive information.[28] Indeed, despite Walgreens' extensive use of manual redactions for displayed and inputted data, the Session Replay Provider still gained access to full names of website visitors, their medical conditions, and their prescriptions.[29]

43.     Following the Walgreens incident, Bonobos, a men's clothing retailer, announced it was eliminating data sharing with a Session Replay Provider after it was discovered that the Session Replay Provider captured credit card details, including the cardholder's name and billing address, and the card's number, expiration, and security code from the Bonobos' website.[30]

44.     Recognizing the privacy concerns posed by Session Replay Code, in 2019 Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their iPhone apps or face immediate removal from the app store.[31] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[32]

---

[26] Zach Whittaker, *Many Popular iPhone Apps Secretly Record Your Screen Without Asking*, TechCrunch (Feb. 6, 2019), https://techcrunch.com/2019/02/06/iphone-session-replay-screenshots/.
[27] *Id.*
[28] Nitasha Tiku, *The Dark Side of 'Replay Sessions' That Record Your Every Move Online*, WIRED (Nov. 16, 2017), https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/.
[29] Englehardt, *supra* note 20.
[30] Tiku, *supra* note 25.
[31] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.
[32] *Id.*

### D. Bloomingdale's Secretly Wiretaps Bloomingdale's Website Visitors' Electronic Communications.

45.     Bloomingdale's operates the website www.bloomingdales.com. Bloomingdale's is an online and brick-and-mortar fashion retailer, offering men's and women's apparel, accessories, shoes, and more.

46.     Bloomingdale's further integrated its online, website operations with its brick-and-mortar retail operations, thus encouraging consumers to use either (or both) in any individual transaction. For example, a customer may visit a brick-and-mortar store to view and/or try on goods but then purchase those goods online. As a result of this integration, it is impossible to separate the website operations from the brick-and-mortar operations.

47.     However, unbeknownst to the millions of individuals perusing Bloomingdale's products online, and those purchasing Bloomingdale's products for delivery or in-store pickup, Bloomingdale's intentionally procures and embeds various Session Replay Codes from Session Replay Providers on the Bloomingdale's website to track and analyze website user interactions with www.bloomingdales.com.  The Session Replay Code and the presence of Session Replay Providers violates the rights of customers, including plaintiff, to have a shopping experience with a retailer and not an unknown and hidden entity lurking in the background and participating in what the shopper reasonably believes is a communication between the shopper and the seller.

48.     One such Session Replay Provider that Bloomingdale's procures and uses without the knowledge or consent of Plaintiff is FullStory.

49.     FullStory is the owner and operator of a Session Replay Code titled FullStory Script, which records - with only Bloomingdale's knowledge or consent - all website visitor actions, including information typed into text fields by the website users while on the website,  including names, emails, phone numbers, addresses, Social Security numbers, dates of birth, and more; research by the Princeton University Center for Information Technology Policy found that "text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all

without any visual indication to the user."[33]  And again, the content which is captured is important in showing how pervasive this practice is, and can be further explored during discovery, but, the mere fact that FullStory is capturing *anything* is the harm which plaintiff alleges violates her and Class Members' statutory and common law rights.

50.     As a user interacts with any website with the embedded FullStory Script, "each click, tap, URL visit, and every other interaction is sent in tiny little packets to that existing session at FullStory servers."[34] This includes button clicks, mouse movements, scrolling, resizing, touches (for mobile browsers), key presses, page navigation, changes to visual elements in the browsers, network requests, and more.[35]

51.     Bloomingdale's procurement and use of FullStory's Session Replay Code, and procurement and use of other Session Replay Codes through various Session Replay Providers without the knowledge or consent of Plaintiff and Class Members, is a wiretap in violation California statutory and common law.

**E.     Plaintiff's and Class Members' Experience.**

52.     Plaintiff visited Bloomindale's, both at its brick-and-mortar stores and through www.bloomingdales.com on her computer, while in California. Through these visits, Plaintiff viewed merchandise sold by Bloomingdale's both online and in retail stores. Plaintiff purchased goods from Bloomingdale's using the Bloomingdale's website to be delivered and/or picked up at the retail stores.

53.     While visiting Bloomingdale's website, Plaintiff was a victim of Defendants' unlawful monitoring, recording, and collection of Plaintiff's Website Communications with www.bloomingdales.com.

54.     Plaintiff was a victim by virtue of the fact that unknown to Plaintiff, Defendants procured and embedded Session Replay Code on the Bloomingdale's website.

---

[33] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

[34] *Id.*

[35] *How does FullStory capture data to recreate my users' experience?*, FullStory, https://help.fullstory.com/hc/en-us/articles/360032975773-How-does-FullStory-capture-data-to-recreate-my-users-experience-, (last visited Aug. 18, 2022) (hereinafter "FullStory Data Capture").

55.     During her website visit, Plaintiff's Website Communications were captured by Session Replay Code and sent to various Session Replay Providers.  At no time while her activities were being captured was Plaintiff made aware of or provided meaningful (or any) consent to the presence of a Session Replay Provider which was – in real time- taking her every movement and chronicling it for the use and financial benefit of Bloomingdales.com.

56.     For example, when visiting www.bloomingdales.com, when a website user merely views a product, that information is captured by the Session Replay Codes embedded on the website:



*Depicting information sent to one of the Service Replay Providers—FullStory—through a Service Replay Code—FullStory Script—after searching for "movado mens watch" while visiting www.bloomingdales.com.*

57.     Similarly, when a user moves a product onto their "Wish List" on www.bloomingdales.com, that information too is captured by Service Replay Providers:

FIRST AMENDED AND RESTATED COMPLAINT

*Depicting information sent to one of the Service Replay Providers—FullStory—through a Service Replay Code—FullStory Script—after adding a "Movado BOLD Chronograph, 42 mm" to a wish list on www.bloomingdales.com.*

58.     The wiretapping by the Session Replay Codes is ongoing during Plaintiff's visit and intercepts both record data (the "when" and "where" data) and contents (the "what" data) of the communications between Plaintiff and Bloomingdale's with instantaneous transmissions to the Session Replay Provider. For example, as illustrated below, it took only 61 milliseconds for a packet of event response data, indicating whatever actions the website user had just taken to be shared with the Session Replay Provider:

59.     The Session Replay Codes operate in the same manner for all putative Class members.

60.     Like Plaintiff, each Class member visited www.bloomingdales.com with Session Replay Code embedded in it, and those Session Replay Codes intercepted the Class members' Website Communications with www.bloomingdales.com by sending hyper-frequent logs of those communications - both record and content - to Session Replay Providers. This happens without any attempt to inform or educate Plaintiff or Class Members of even the presence of a third-party taking their information from them.

61.     Even if Defendants mask certain elements when configuring the settings of the Session Replay Code embedded on the Bloomingdale's website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

62.     For example, even with heightened masking enabled, Session Replay Providers will still learn through the intercepted data exactly which pages a user navigates to, how the user moves through the page (such as which areas the user zooms in on or interacted with), the nature and content of any searches conducted by the user, and additional substantive information.

63.     As a specific example, when a user types a product into Bloomingdale's main search bar and initiates a search, even if the text entered into the search bar is masked, Session Replay Providers still captures what was entered into the search bar as soon as the search result page loads. This is so because the responsive search results will be displayed on the subsequent page, and the responsive content generated by Bloomingdale's will repeat the searched information back on the generated page. That information will not be masked even if user-inputted text is fully masked in a text field.

**F.     Plaintiff and Class Members Did Not Consent to the Interception of Their Website Communications.**

64.     Plaintiff and Class members did not provide prior consent to Bloomingdale's interception of their Website Communications either directly or through the use of a Session Replay Provider, nor could they, as the interception begins *immediately* upon arriving at www.bloomingdales.com.

65.     As the 2017 study recognized, the extent of data collected by Session Replay Code "far exceeds user expectations [1]; text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user."[36]

66.     Bloomingdale's does not ask website visitors, including Plaintiff and Class members, for prior consent before wiretapping (directly or through a Session Replay Provider) their Website Communications. Indeed, Plaintiff and Class members have no idea upon arriving at the website that Bloomingdale's is using Session Replay Code, provided by an unknown and unidentified third-party, to monitor, collect, and record their Website Communications because the Session Replay Code is seamlessly incorporated and embedded into the Bloomingdale's website.

67.     Further, while Bloomingdale's purports to maintain a "Privacy Policy," which is insufficient for Plaintiff and Class members to furnish prior consent. First, because the wiretapping begins the moment a website user visits www.bloomingdales.com, Plaintiff and Class members had no opportunity to review the Privacy Policy before the wiretapping began and therefore can only provide insufficient and subsequent consent after the wiretapping has already occurred.

[36] Englehardt, *supra* note 20.

68.     Second, a reasonable person would not be on notice of the terms of Bloomingdale's Privacy Policy by way of normal interaction with the website. Bloomingdale's privacy policy is contained on the homepage of www.bloomingdales.com, buried at the very bottom of the website in tiny, non-contrasting font that is unobtrusive and easy to overlook. As such, a reasonable person could browse Bloomingdale's website without ever being on notice of the website's purported Privacy Policy.  Additionally, any language that does not clearly identify that a third-party is present, let alone actively capturing every movement made by a website visitor during the course of their visit, or being stored, shared, and potentially sold is completely ineffective.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in California whose Website Communications were captured through the use of Session Replay Code embedded in www.bloomingdales.com.

70.     Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

71.     **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may be obtained from the books and records of Bloomingdale's or the Session Replay Providers.

72.     **Commonality:** This action involves questions of law and fact that are common to the Class members. Such common questions include, but are not limited to: (a) whether Defendants procure Session Replay Providers to intercept Bloomingdale's website visitors' Website Communications; (b) whether Defendants intentionally disclose the intercepted Website Communications of their website users; (c) whether Defendants acquire the contents of website users' Website Communications without their consent; (d) whether Defendants' conduct violates the

California Invasion of Privacy Act, Cal. Penal Code §630 *et seq.* and/or whether constitute a tortious invasion of privacy and/or intrusion on seclusion (e) whether Plaintiff and the Class members are entitled to equitable relief; and (f) whether Plaintiff and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

73. **Typicality:** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Class had their communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

74. **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor her counsel have any interests adverse to the interests of the other members of the Class.

75. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

76. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and

injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendants intercepted Plaintiff's and Class members' Website Communications, then Plaintiff and each Class member suffered damages by that conduct.

77.     **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Bloomingdale's books and records or the Session Replay Providers' books and records.

## COUNT I

### VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 630 et. seq.

78.     Plaintiff incorporates the above allegations by reference as if fully set forth herein and brings this count individually and on behalf of the Class.

79.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630-638. The Act contains the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

80.     California Penal Code § 631(a) accordingly provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

81.     At all relevant times, Bloomingdale's business practice of injecting Session Replay Code allowed Bloomingdale's to access, intercept, learn the contents of and collect Plaintiff and Class members' personally identifiable information and other data.

82.     Plaintiff, and each Class Member, visited and/or interacted with the Bloomingdale's website in California.

83.     Plaintiff and Class members did not consent to any of Bloomingdale's actions in intercepting, reading, and learning the contents of their communications.

84.      Bloomingdale's conduct was intentional in that Bloomingdale's purposefully installed code which allows Bloomingdale's to eavesdrop and learn the content of users' communications and other browsing activities that would otherwise be unavailable to Bloomingdale's without engaging in this practice. Bloomingdale's directly participated in the interception, reading, and/or learning of the contents of the communications between Plaintiff, Class members, and California-based web entities.

85.     Additionally, Bloomingdale's wrongfully, negligently and/or intentionally, aided, abetted, conspired with and/or employed the Session Replay Providers, including but not limited to FullStory, to unlawfully and without the consent of all parties recorded, read and/or otherwise gain access to the electronic communication(s) of Plaintiff and Class members and/or otherwise violate California law, including California Penal Code § 631(a).

86.     The information Bloomingdale's intercepts, or aids the Session Replay Providers in intercepting, while Plaintiff and Class members are using Bloomingdale's website includes personally identifiable information and other highly specific information and communications, including, without limitation, every button, keystroke and link a user taps, whether the user has taken any screenshots, text entries (including passwords and credit card information), how much time a user spent on the website, what products were viewed and/or searched for, and other "what" data (i.e., content) of the communications.

87.     Plaintiff and Class members have suffered loss by reason of these violations, including but not limited to, violation of the right to privacy. Unless restrained and enjoined, Bloomingdale's will continue to commit such acts.

88.     As a result of the above violations and pursuant to CIPA section 637.2, Bloomingdale's is liable to Plaintiff and Class members for the greater of treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 provides "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

89.     Plaintiff further requests, as provided under CIPA, reasonable attorneys' fees and costs of suit, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury sufficient to prevent or deter the same or similar conduct by Bloomingdale's.

## COUNT II

### INVASION OF PRIVACY – INTRUSION UPON SECLUSION

90.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

91.     California law recognizes the tort of invasion of privacy/intrusion on seclusion.

92.     Plaintiff brings this claim individually and on behalf of the Class.

93.     Plaintiff and Class members have an objective, reasonable expectation of privacy in their Website Communications. By way of example, Plaintiff and Class Members had no reason to believe that the fact of or the content of their Website Communications would be intercepted by and/or provided to third parties, including the Session Replay Provider.

94.     Plaintiff and Class members did not consent to, authorize, or know about Bloomingdale's invasion/intrusion at the time it occurred. Plaintiff and Class members never agreed that Bloomingdale's or its undisclosed Session Replay Provider could collect or disclose their Website Communications.

95.     Plaintiff and Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

96.     Bloomingdale's, through the undisclosed and nonconsensual presence of Session Replay Providers to collect, capture, disseminate and profit from any activities conducted by Plaintiff

and Class members while visiting bloomingdales.com, intentionally intrudes on Plaintiff's and Class members' private life, seclusion, or solitude, without consent.

97.     Bloomingdale's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

98.     Plaintiff and Class members were harmed by Bloomingdale's wrongful conduct as Bloomingdale's conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

99.     Bloomingdale's conduct has needlessly harmed Plaintiff and the Class by allowing an undisclosed third-party to capture personal facts and data in the form of their Website Communications. This nonconsensual disclosure and loss of privacy and confidentiality has caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

100.    Additionally, given the monetary value of individual personal information, and the potential for defendant and its third-party Session Replay Provider to profit from the use or sale of such information, Defendants deprived Plaintiff and Class members of the economic value of their interactions with Defendants' website, without providing proper consideration for Plaintiff's and Class members' property.

101.    Further, Defendants have improperly profited from their invasion of Plaintiff and Class members' privacy in their use of Class members' data for its economic value.

102.    As a direct and proximate result of Bloomingdale's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

103.    Bloomingdale's conduct is ongoing, and Bloomingdale's continues to unlawfully intercept, and to permit the nonconsensual presence of and interception by Session Replay Providers, of the communications of Plaintiff and Class members any time they visit Defendants' website with Session Replay Code enabled without their consent. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## **REQUEST FOR RELIEF**

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully request that the Court enter judgment in Plaintiff's and the Class's favor and against Defendants as follows:

A.     Certifying the Class and appointing Plaintiff as the Class representative;

B.     Appointing Plaintiff's counsel as Class counsel;

C.     Declaring that Defendants' past conduct was unlawful, as alleged herein;

D.     Declaring Defendants' ongoing conduct is unlawful, as alleged herein;

E.     Enjoining Defendants from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.     Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.     Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H.     Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.     Granting such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

**DATED**: October 27, 2023

Respectfully Submitted,

*/s/ Steven M. Nathan*
Steven M. Nathan, SBN 153250
**HAUSFELD LLP**
33 Whitehall Street
Fourteenth Floor
New York, NY 10004
Telephone: (646) 357-1100
Email: snathan@hausfeld.com

James J. Pizzirusso, D.C. Bar No. 477604
**HAUSFELD LLP**
888 16th Street N.W.
Suite 300
Washington, D.C. 20006
Telephone: (202) 540-7200
Email: jpizzirusso@hausfeld.com

and

Stephen B. Murray (La. Bar No. 9858)
Stephen B. Murray, Jr (La. Bar No. 23877.
Arthur M. Murray (La. Bar No. 27694)
Thomas M. Beh (La. Bar No. 24018)
**THE MURRAY LAW FIRM**
701 Poydras Street, Suite 4250
New Orleans, Louisiana 70139
Telephone: (504) 525-8100
Telecopier: (504) 584-5249
Email: Tbeh@Murray-lawfirm.com

*Counsel for Plaintiff*

FIRST AMENDED AND RESTATED COMPLAINT