STEVEN M. NATHAN, SBN 153250
HAUSFELD LLP
33 Whitehall Street
Fourteenth Floor
New York, NY 10034
Tel: (646) 357-1100
Fax: (212) 202-4322
snathan@hausfeld.com

*Attorneys for Plaintiff*
*(additional counsel on signature page)*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERICA MIKULSKY, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>v.<br><br>BLOOMINGDALE'S, LLC and BLOOMINGDALES.COM, LLC,<br><br>　　　Defendants. | Case No. 3:23-cv-00425-L-VET<br><br>**JURY TRIAL DEMANDED**<br><br>**SECOND AMENDED COMPLAINT - CLASS ACTION** |

Plaintiff, Erica Mikulsky ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this Second Amended Complaint Class Action ("SAC") against Defendants Bloomingdale's, LLC and Bloomingdales.com, LLC (collectively "Defendant" or "Bloomingdale's"), and in support thereof alleges the following:

## **INTRODUCTION**

1.    This is a class action brought against Bloomingdale's for wiretapping the electronic communications of visitors to Bloomingdale's website, www.bloomingdales.com. Bloomingdale's employs third-parties, such as FullStory, to embed JavaScript tools ("Session Replay Code") on the Bloomingdale's website. That Session Replay Code then purposefully and surreptitiously deploys on each website visitor's own internet browser for the sole purpose of intercepting and recording every website visitor's electronic communications with the Bloomingdale's website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time ("Website Communications"). The Session Replay Code is designed to and does capture highly sensitive personal information (including from Plaintiff), without any notice and therefore without the knowledge or consent of unsuspecting website visitors.

2.    The third-parties (collectively, "Session Replay Providers") who create and deploy Session Replay Code do so at Bloomingdale's direction, and capture and store the Website Communications of every visitor to the Bloomingdale's website.

3.    After intercepting and capturing the Website Communications, Bloomingdale's and the Session Replay Providers use the Website Communications to then recreate website visitors' entire visits to www.bloomingdales.com. The Session Replay Providers analyze and use the intercepted Website Communications to create a video replay of each website visitor's behavior on the website and provide

access to that video to Bloomingdale's for analysis. The acquired Website Communication data is stored and retained by the Session Replay Provider(s) and, upon information and belief, is used for other marketing purposes as well.

4.     Bloomingdale's procurement of the Session Replay Providers to secretly deploy Session Replay Code on the Bloomingdale's website results in the electronic equivalent of a stranger surreptitiously spying on and "looking over the shoulder" of each visitor to the website for the entire duration of their website interaction, even tracking activities and information a visitor would never want or seek to share with Bloomingdale's or its undisclosed Session Replay Providers (such as deleted text and other website visits).

5.     One of the Session Replay Providers employed by Bloomingdale's, FullStory, advertises that its Session Replay Code, FullStory Script, "provide[s] actionable, reliable, and timely insights about the user[,]" enabling Bloomingdale's to "[u]understand[] the real-life *person* engaging online, on the other end of the screen[.]"[1]

6.     As users interact with the Bloomingdale's website, they provide sensitive data during account creation, while making a purchase, and while searching the site. Session Replay Codes use keystroke or input element loggers to collect this sensitive data. According to FullStory, "[s]ession replay is the firehose of information about the online experience. As [website owners] get comfortable with navigating the massive amount of information captured by a session replay tool, [they] will discover new ways to mine [recorded] sessions for insights …."[2]

---

[1] FullStory, *The definitive guide to session replay* (emphasis in original), https://www.fullstory.com/session-replay/#:~:text=Session%20replay%20transforms%20logged%20user,Tap%20for%20sound (last visited Feb. 7, 2024).

[2] *Id.*

7.    "FullStory [also] allows [website owners] to identify sessions by users."[3]

8.    "Another benefit of replay tools [like FullStory] is [website owners] can isolate a set of users—say [] power users or users in a certain geography—and export lists for email marketing campaigns or other marketing strategies."[4] Because "session replay tool[s] allow[] [website owners] to search and analyze segments of users by their behaviors … [website owners] can accurately assess the quality of a given marketing tactic."[5]

9.    The Session Replay Code procured and utilized by Bloomingdale's is not a traditional website cookie, tag, web beacon, or analytics tool. It is sophisticated computer software that enables Session Replay Providers and website owners, like Bloomingdale's, to secretly and contemporaneously intercept, capture, read, observe, re-route, forward, redirect, and receive incoming electronic communications to any website with the embedded Session Replay Code.

10.    Unlike typical website analytics services that provide simple aggregate statistics, the Session Replay Code utilized by Bloomingdale's is intended to and does record and playback specific individual browsing sessions. The technology also permits companies like Bloomingdale's to view the interactions of their website visitors in real-time, including capturing partial text field information that users did not intend to send to the website owner (for example, by closing the browser before hitting "submit"), and certainly did not intend to send to third-party Session Replay Providers.

11.    The troves of data intercepted and collected from website visitors, at Bloomingdale's direction, are stored on servers belonging to and maintained by the

---

[3] *Id.*
[4] *Id.*
[5] *Id.*

Session Replay Providers. "FullStory indexes all user sessions and can be searched for events, users, date & time constraints, clicked elements, URLs, time, location, CSS selectors, and countless other web elements, all of which can be stacked to allow for highly specific segmentation of users based on behavior."[6]

12.    Bloomingdale's procurement and use of Session Replay Codes violates the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*. and constitutes the torts of invasion of privacy and intrusion upon seclusion.

13.    Plaintiff brings this action individually and on behalf of a class of all persons in California whose Website Communications were intercepted through Bloomingdale's procurement and use of Session Replay Code secretly embedded on the webpages of www.bloomingdales.com and seeks all civil remedies provided for under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, and attorneys' fees and costs.

## **PARTIES**

14.    Plaintiff, Erica Mikulsky, is a citizen of the State of California, and at all times relevant to this action, resided and was domiciled in San Diego County, California.

15.    Defendant Bloomingdale's, LLC is a limited liability company formed under the laws of Ohio, with its principal place of business located at 2807 Jackson Avenue, Long Island City, New York. Bloomingdale's, LLC is a citizen of New York.

16.    Defendant Bloomingdales.com, LLC is a limited liability company formed under the laws of Ohio, with its principal place of business located at 2807

---

[6] *See id.* ("FullStory captures every session where the script is installed. No sampling means no bug goes uncaptured, no niche experience missed, and every support ticket can be tied to a specific customer experience.").

Jackson Avenue, Long Island City, New York. Bloomingdales.com, LLC is a citizen of New York.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than Defendant.

18.    This Court has personal jurisdiction over Bloomingdale's because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in California. Further, Bloomingdale's purposefully directed its activities to California, consummated transactions in California, and purposefully availed itself of the privilege of conducting activities in California, thereby invoking the benefits and protections of California law. Specifically, Plaintiff, while in California, accessed and viewed the Bloomingdale's website, both to view merchandise subsequently purchased from brick-and-mortar Bloomingdale's stores and to make purchases of merchandise completely online.

19.    The privacy violations complained of herein resulted from Bloomingdale's purposeful and tortious acts directed towards citizens of California while those citizens were located within California. At all relevant times, Bloomingdale's knew its practices directly resulted in the collection of information from California citizens while those citizens browsed and made purchases on www.bloomingdales.com. Bloomingdale's chose to avail itself of the business opportunities of marketing and selling their goods in California and, in so doing, intercepted, and collected – directly or through the use of undisclosed third-party

Session Replay Providers – real-time data from website sessions initiated by Plaintiff while located in California, and the claims alleged herein arise from those activities.

20.    Bloomingdale's also knows many users visit and interact with the Bloomingdale's website while they are physically present in California. Both desktop and mobile versions of the Bloomingdale's website allow users to search for nearby stores in California and provide directions to these stores based on the user's location. Further, the Bloomingdale's website permits visitors, including those in California, to book appointments through the Bloomingdale's website with representatives at Bloomingdale's brick-and-mortar stores in California. Bloomingdale's offering of such location services means that Bloomingdale's is aware its website is visited by people located in California, and that these California website visitors are being wiretapped in violation of California statutory and common law.

21.    In addition to the ability to use its website to funnel California customers to Bloomingdale's California stores, the Bloomingdale's website is further integrated with the operations of its brick-and-mortar stores in California, by offering numerous unified services, including, as noted above: (1) on-line booking of appointments[7] at brick-and-mortar Bloomingdale's stores, including those stores located in California; (2) enabling customers to purchase goods via the website for pick-up at Bloomingdale's brick-and-mortar store(s), including those stores located in California; (3) advertising opportunities to enable customers to view and/or participate in in-store events through the Bloomingdale's website ("Our in-store events have gone virtual! Mark your calendar for upcoming events and check out

---

[7] Bloomingdale's, *Book an in-store or virtual appointment*, https://ui.timetrade.ca/app/bloomingdales/workflows/bloomingdales003/schedule/location?wfsid=kudv0t34eo6pe39rtv5p6u97fhteavhg&ch=footer&fs=1 (last visited Feb. 6, 2024).

our records of past demos, discussions and styling sessions with some of our favorite designers and tastemakers."[8]); (4) offering appointments with stylists for both on-line and in-store consultations; and (5) other integrated operations.[9] As a result of this integration, the Bloomingdale's website acts as a conduit to additional sales and services available in its 16 brick-and-mortar stores in California.[10] Stated another way, Bloomingdale's website operations and its operation of the brick-and-mortar stores in California constitute an integrated single business operating in the State of California.

22.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.    Website User and Usage Data Have Immense Economic Value.

23.    According to *The Economist*, the "world's most valuable resource is no longer oil, but data."[11]

24.    In 2022, Business News Daily reported that some businesses, like Bloomingdale's, collect detailed and sensitive personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., how consumers interact with a business's website, applications, and emails), behavioral

---

[8] *See, e.g.*, Bloomingdale's, *Bloomingdale's On* Screen, https://www.bloomingdales.com/c/editorial/onscreen/holiday-sneak-peek-with-charlotte-tilbury/ (last visited Feb. 6, 2024).

[9] *See, e.g.*, Bloomingdale's, *Shopping Services*, https://www.bloomingdales.com/b/about-us/appointment-scheduling-in-store-services/?tagid=2670442_04_02 (last visited Feb. 6, 2024).

[10] *See* Bloomingdale's, *Bloomingdale's Locator*, https://locations.bloomingdales.com/index.html (last visited Feb. 6, 2024).

[11] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.

data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., data on consumer satisfaction) from consumers.[12] This information is highly valuable to companies because they use this data to refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[13]

25.    In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[14]

26.    This is not new. In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[15] In this paper, the OECD measured prices demanded by companies for user data derived from "various online data warehouses."[16]

27.    The OECD indicated, "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government

---

[12] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, Business News Daily (updated Oct. 20, 2023), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.
[13] *Id.*
[14] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.
[15] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.
[16] *Id.* at 25.

ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[17] These costs have only gone up.

**B.    Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

28.    Consumers are skeptical and wary about their personal data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[18]

29.    Another recent paper indicates most website visitors assume their detailed interactions with a website will only be used, at most, by the website itself and will not be shared with a party they know nothing about.[19] As such, website visitors reasonably expect their interactions with a website should not be released to third parties unless explicitly stated.[20]

30.    Privacy polls and studies show a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

31.    A recent study by Consumer Reports shows 92 percent of Americans believe internet companies and websites should be required to obtain consent before

---

[17] *Id.*

[18] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (updated Nov. 3, 2022), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

[19] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[20] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[21]

32.    Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79 percent, are concerned about how their data is collected by companies.[22]

33.    Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[23]

**C.    How Session Replay Code Works.**

34.    Session Replay Code, such as that implemented on www.bloomingdales.com, enables Session Replay Providers to intercept, record, save, and replay website visitors' interactions with a given website. The clandestinely deployed software provides online marketers and website designers with sensitive information about the user experience by recording website visitors,

---

[21] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017),
https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907.
[22] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019),
https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confused-and-feeling-lack-of-control-over-their-personal-information/.
[23] Margaret Taylor, *How Apple screwed Facebook*, Wired (May 19, 2021),
https://www.wired.co.uk/article/apple-ios14-facebook.

such as Plaintiff and the Class, "as they click, scroll, type or navigate across different web pages."[24]

35.    To explain how Session Replay Code works, FullStory says: "Imagine someone took detailed notes about your day—where you went and when, what it looked like, what you did, how you acted, etc. Then, they took those notes, rebuilt the scenes, and hired actors to play the parts, using the notes like a script to recreate the day just like it actually occurred. [ … ] [U]nlike video, session replay is immensely rich in meaningful data—data that platforms with powerful session replay can use to surface valuable insights about user behavior and interaction with a website or application."[25]

36.    Session Replay Code goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and websites, intercepting not only the "where" and "when" data (often referred to as "record data") but also the "what" (the content of the communications). Unlike other online advertising tools, Session Replay Code captures and records every action a website visitor takes while on the website, including actions that reveal the visitor's personal or private sensitive data, even when the visitor does not intend to submit the data to the website operator, or has not finished submitting the data to the website operator.[26] As a result, website visitors "aren't just sharing data

---

[24] Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.
[25] FullStory, *The definitive guide to session replay* (emphasis in original), https://www.fullstory.com/session-replay/#:~:text=Session%20replay%20transforms%20logged%20user,Tap%20for%20sound (last visited Feb. 7, 2024).
[26] Erin Gilliam Haije, *[Updated] Are Session Recording Tools a Risk to Internet Privacy?*, Mopinion (Mar. 7, 2018), https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/.

with the [web]site they're on … but also with an analytics service that may be watching over their shoulder."[27]

37.    FullStory explains that "[s]ession replay capabilities elevate traditional web analytics tools by showing a complete picture of the user on a website or app. They provide all the individual data points you get with a typical analytics tool *and* how those data points combine to create an *experience*."[28]

38.    Session Replay Code works by inserting a program into the various event handling routines that web browsers use to receive input from users, thus intercepting the occurrence of actions the user takes. When a website delivers Session Replay Code to a user's browser, the browser follows the program's instructions by sending responses in the form of "event" data to a designated third-party server.

39.    The server receiving the event data is owned and controlled by the third-party Session Replay Provider that wrote the Session Replay Code, rather than the owner of the website where the program is installed. The presence of the Session Replay Provider is not made known to or consented to by the website user and thereby renders this type of data collection illegal.

40.    The types of events captured by Session Replay Code vary by specific product and configuration, but in general are wide-ranging and encompass every user action, including all mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and

---

[27] Eric Ravenscraft, *Almost Every Website You Visit Records Exactly How Your Mouse Moves*, Medium (Feb. 5, 2020), https://onezero.medium.com/almost-every-website-you-visit-records-exactly-how-your-mouse-moves-4134cb1cc7a0.

[28] FullStory, *The definitive guide to session replay* (emphasis in original), https://www.fullstory.com/session-replay/#:~:text=Session%20replay%20transforms%20logged%20user,Tap%20for%20sound (last visited Feb. 7, 2024) (emphasis in original).

interaction through the website. To permit a reconstruction of a user's visit accurately, Session Replay Code captures these events at hyper-frequent intervals, often just milliseconds apart. Events are accumulated and transmitted in blocks periodically throughout the user's website session, rather than after the user's visit to the website is finished.

41.    As the events from a user's session are recorded by Session Replay Code, a website operator is able to view a visual reenactment of the website user's visit through the Session Replay Provider, meaning "[u]nlike typical analytics services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions."[29]

42.    The replay session shared with the website owner (here, Bloomingdale's) is created without the consent or knowledge of the website user. Even if a user knew she was being monitored by the website owner, she certainly did not know such monitoring was being conducted by an unknown and (to her) uninvited spectator acting at the direction of the website owner.

43.    Because most Session Replay Codes will, by default, capture the maximum range of user-initiated events and content displayed by the website, researchers have found that a variety of highly sensitive information is captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on webpages.[30]

44.    Even if specifically masked through configurations chosen by the website owner, visible contents of the website and other sensitive information are still transmitted to the Session Replay Provider. Regardless of configuration, website

---

[29] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[30] *Id.*

users (including Plaintiff and Class Members herein) have no way of knowing the extent to which their interactions with a website, such as www.bloomingdales.com, are captured, stored, shared, sold, or otherwise used.

45. Most alarming, Session Replay Code captures content and data the user did not intend to transmit to a website during a visit, and then makes that content and data available to website owners by providing access to the session replay through the Session Replay Provider. For example, if a user types information into a text form field, but decides not to click a "submit" or "enter" button on the website, the Session Replay Code will nevertheless cause the non-submitted text to be sent to the designated event-response-receiving server before the user deletes the text or leaves the page. This information is then viewable to the website owner in the form of the session replay, which is only accessible to the website owner through the Session Replay Provider.

46. Session Replay Code does not anonymize user sessions.

47. First, if a user enters personally identifying information that is captured in an event response, that data becomes known and visible to the Session Replay Provider and the website owner.

48. Second, when a website displays user account information to a logged-in user, that content is also captured by Session Replay Code.

49. Third, Session Replay Codes enable Session Replay Providers and website owners, like Bloomingdale's, to "identify specific sessions by user" and

"even allows [website owners] to co-browse with users 'live.'"[31] As FullStory admits, its software "allows [website owners] to identify sessions by users."[32]

50. Moreover, Session Replay Providers create "fingerprints" that are unique to a specific user's combination of computer and browser settings, screen configuration, and other detectable information. The resulting "fingerprints," are collected across all sites the Session Replay Provider monitors. Thus, a user's "fingerprint" is tracked as they navigate across multiple websites with embedded Session Replay Code.

51. When a user identifies themselves on a website (such as by filling in a form), the Session Replay Provider associates the "fingerprint" with a specific user's identity and back-references that user's other web browsing, including on websites where the user intended to remain anonymous (by, for example, enabling private browsing).[33]

52. The ability to create "fingerprints" of otherwise anonymous users provides Session Replay Providers and website owners with the ability to target potential customers with advertising based on their website browsing habits, creating a marketing plan aimed at potential customers based on their browsing across

---

[31] FullStory, *The definitive guide to session replay* (emphasis in original), https://www.fullstory.com/session-replay/#:~:text=Session%20replay%20transforms%20logged%20user,Tap%20for%20sound (last visited Feb. 7, 2024).

[32] *Id.*; *see also FS.identify – Identifying users*, FullStory, https://help.fullstory.com/hc/en-us/articles/360020828113 (last visited Feb. 6, 2024).

[33] *See, e.g.*, FullStory, *Fortive powers evidence-backed digital testing across 40+ websites*, https://www.fullstory.com/customer-story/saas/fortive/ (last visited Feb. 8, 2024).

multiple websites and despite the fact that the potential customers specifically demonstrated an intent to remain anonymous to many of the websites.[34]

53.    In addition to the privacy invasions caused by the diversion of user communications with websites to third-party Session Replay Providers, Session Replay Code also exposes website visitors to identity theft, online scams, and other privacy threats.[35] Indeed, "[t]he more copies of sensitive information that exist, the broader the attack surface, and when data is being collected … it may not be stored properly or have standard protections[,]" increasing "the overall risk that data will someday publicly leak or be breached."[36]

54.    The privacy concerns arising from Session Replay Code are not theoretical or imagined. The CEO and founder of LOKKER, a provider of data privacy and compliance solutions has said "[consumers] should be concerned" about the use of Session Replay Code because "they won't know these tools are operating 'behind the scenes' of their site visit[,]" and "even if the company disclosed that they are using these tools, consumers wouldn't likely be able to opt-out and still use the site."[37]

55.    Indeed, the news is replete with examples of the dangers of Session Replay Code. For example, in 2019, the App Analyst, a mobile expert who writes

---

[34] *See id.*; *see also* FullStory, *Delight, win, and retain more customers*, https://www.fullstory.com/why-fullstory/ (last visited Feb. 8, 2024).

[35] Juha Saarinen, *Session Replay is a Major Threat to Privacy on the Web*, itnews (Nov. 16, 2017), https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720.

[36] Lily Hay Newman, *Covert 'Replay Sessions' Have Been Harvesting Passwords by Mistake*, WIRED (Feb. 26, 2018), https://www.wired.com/story/covert-replay-sessions-harvesting-passwords/.

[37] Mark Huffman, *Is 'session replay software' a privacy threat or just improving your web experience?*, Consumer Affairs (Oct. 25, 2022), https://www.consumeraffairs.com/news/is-session-replay-software-a-privacy-threat-or-just-improving-your-web-experience-102522.html.

about his analyses of popular apps, found that even though Air Canada's iPhone app was "meant to mask certain fields, [it] inadvertently exposed" unencrypted passport numbers, credit card data, and password information.[38] This discovery was made just weeks after Air Canada said its app had a data breach, exposing 20,000 profiles.[39]

56.    Multiple companies removed FullStory's Session Replay Code from their websites after discovering the Session Replay Code captured highly sensitive information. For instance, in 2017, Walgreens stopped sharing data with FullStory after it was discovered that—despite Walgreens' extensive use of manual redactions for displayed and inputted data—FullStory still intercepted, captured, and stored full names of website visitors, their medical conditions, and their prescriptions.[40]

57.    Following the Walgreens incident, Bonobos, a men's clothing retailer, announced it stopped working with FullStory after it was discovered that FullStory captured and stored credit card details (including the cardholder's name and billing address, and the user's full credit card number, expiration, and security code) from visitors to the Bonobos website.[41]

58.    In 2019, recognizing the privacy concerns posed by Session Replay Code, Apple required app developers to remove or properly disclose the use of analytics code that allow app developers to record how a user interacts with their

---

[38] Zach Whittaker, *Many Popular iPhone Apps Secretly Record Your Screen Without Asking*, TechCrunch (Feb. 6, 2019), https://techcrunch.com/2019/02/06/iphone-session-replay-screenshots/.

[39] *Id.*

[40] Englehardt, *supra* note 29; *see also* Nitasha Tiku, *The Dark Side of 'Replay Sessions' That Record Your Every Move Online*, WIRED (Nov. 16, 2017), https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/.

[41] Englehardt, *supra* note 29; Tiku, *supra* note 40.

iPhone apps or face immediate removal from the app store.[42] In announcing this decision, Apple stated: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[43]

59.    The highly sensitive information intercepted and captured by Session Replay Codes is stored and maintained by the Session Replay Providers, who repurpose the data from its raw state into a new product to provide the visual session replay for website owners like Bloomingdale's. The surreptitious nature of the monitoring, interception, and disclosure of this private information is highly offensive and beyond the expectations of a reasonable individual.

**D.    Bloomingdale's Secretly Wiretaps its Website Visitors' Electronic Communications.**

60.    Bloomingdale's    owns    and    operates    the    website www.bloomingdales.com. Bloomingdale's is an online and brick-and-mortar fashion retailer, offering men's and women's apparel, accessories, shoes, and more.

61.    Bloomingdale's integrated its website operations with its brick-and-mortar retail operations, encouraging consumers to use either (or both) in any individual transaction. For example, a customer may visit a brick-and-mortar store to view and/or try on goods but then purchase those goods online. As a result of this integration, it is impossible to separate the website operations from the brick-and-mortar operations.

---

[42] Zack Whittaker, *Apple Tells App Developers to Disclose or Remove Screen Recording Code*, TechCrunch (Feb. 7, 2019), https://techcrunch.com/2019/02/07/apple-glassbox-apps/.
[43] *Id.*

62.    Unbeknownst to the millions of individuals perusing Bloomingdale's products online, and those purchasing Bloomingdale's products for delivery or in-store pickup, Bloomingdale's secretly procures and embeds various Session Replay Codes from Session Replay Providers on the Bloomingdale's website to track and analyze website user interactions with www.bloomingdales.com—including, but not limited to, purchasing goods and services, submitting Bloomingdale's credit card applications,[44] and managing online accounts.[45]

63.    The Session Replay Code and the presence of Session Replay Providers violates the rights of customers, including Plaintiff and Class Members, to have a shopping experience with a retailer and not an unknown, hidden entity lurking in the background and actively participating in (and secretly recording) what the shopper reasonably believes is an interaction between only the shopper and the retailer.

64.    Each of the Session Replay Codes used by Bloomingdale's provides detailed information about website user sessions, interactions, and engagement, with the capacity to break down and identify users by device type, location, and other dimensions.[46]

65.    FullStory is the owner and operator of a Session Replay Code called FullStory Script, which records – with only Bloomingdale's knowledge or consent – all website visitor actions, including information typed into text fields by website

---

[44] Bloomingdale's, *Bloomingdale's Credit Card*, https://www.bloomingdales.com/my-credit/gateway/guest (last visited Feb. 6, 2024).

[45] Bloomingdale's, *My Account*, https://www.bloomingdales.com/account/signin (last visited Feb. 6, 2024).

[46] *See* FullStory, *The definitive guide to session replay* (emphasis in original), https://www.fullstory.com/session-replay/#:~:text=Session%20replay%20transforms%20logged%20user,Tap%20for%20sound (last visited Feb. 7, 2024).

users while on the website, such as names, email addresses, phone numbers, mailing addresses, credit card numbers, account login information, and more.

66.    Research by the Princeton University Center for Information Technology Policy found that "text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user."[47] The fact that FullStory – a third party – is capturing *anything* violates users' statutory and common law rights.

67.    As a user interacts with the Bloomingdale's website with FullStory embedded, each click, tap, URL visit, and every other interaction is sent in tiny packets to that existing session at FullStory servers.[48] This includes button clicks, mouse movements, scrolling, resizing, touches (for mobile browsers), key presses, page navigation, changes to visual elements in the browsers, network requests, and more.[49]

68.    On information and belief, FullStory also creates "fingerprints," as described above, which enable FullStory to identify individual users by tracking their movements across multiple websites, including www.bloomingdales.com, even when the user believes they are browsing in "private" mode.

69.    Bloomingdale's procurement and use of FullStory's Session Replay Code, and procurement and use of other Session Replay Codes through various Session Replay Providers, without the knowledge or consent of Plaintiff and Class Members, is a wiretap in violation California statutory and common law.

---

[47] Englehardt, *supra* note 29.

[48] *Id.*

[49] FullStory, *How does FullStory capture data to recreate my users' experience?*, https://help.fullstory.com/hc/en-us/articles/360032975773-How-does-FullStory-capture-data-to-recreate-my-users-experience- (last visited Feb. 6, 2024) (hereinafter "FullStory Data Capture").

### E.    Plaintiff's and Class Members' Experience.

70.    Plaintiff visited Bloomingdale's, at its brick-and-mortar stores and through www.bloomingdales.com on her computer, while in California. Through these visits, Plaintiff viewed merchandise sold by Bloomingdale's online and in retail stores. Plaintiff purchased goods from Bloomingdale's using the Bloomingdale's website to be delivered and/or picked up at the retail stores. In making these purchases, Plaintiff agreed to disclose her credit card data, her mailing address, and other personal information solely to Bloomingdale's. Plaintiff would not have made those purchases had she known that her every movement on the website was being monitored and recorded by a third party.

71.    While visiting the Bloomingdale's website, Plaintiff was a victim of Bloomingdale's and FullStory's unlawful monitoring, recording, and collection of her Website Communications with www.bloomingdales.com.

72.    Plaintiff was a victim by virtue of the fact that, unknown to her, Bloomingdale's procured and embedded FullStory's Session Replay Code on its website.

73.    During her website visits, Plaintiff's Website Communications were captured by Session Replay Code and sent to Session Replay Providers, including FullStory. At no time while her activities were being captured was Plaintiff made aware of or asked to provide consent to the presence of a Session Replay Provider which was – in real time – capturing and chronicling her every movement for the use and financial benefit of Bloomingdale's and the Session Replay Provider. In fact, Plaintiff did *not* consent to these activities.

74.    Plaintiff reasonably expected her visits to the Bloomingdale's website were private and that Bloomingdale's would not have procured a third party to track, record, and/or watch Plaintiff as she browsed, searched, and interacted with the website, particularly because Plaintiff was not presented with any type of disclosure,

consent form, or privacy policy alerting Plaintiff that her website visits were being recorded by Bloomingdale's through a third party.

75.    Bloomingdale's data collection is highly offensive, and Plaintiff suffered concrete injury from Bloomingdale's vast collection, aggregation, and use of Plaintiff's personal browsing histories without her consent.

76.    For example, when visiting www.bloomingdales.com, when a website user views a product, adds a product to their cart, or submits a credit card application, that information is captured by the Session Replay Code embedded on the website. As shown in the screenshot below, the specific item being viewed by the user, here the "Movado mens watch," is captured by the Session Replay Code:



*Depicting information sent to one of the Service Replay Providers— FullStory—through a Service Replay Code—FullStory Script—after searching for "movado mens watch" while visiting* www.bloomingdales.com.

77.    Similarly, when a user moves a product to their "Wish List" on www.bloomingdales.com, that information too is captured by Service Replay Providers:



*Depicting information sent to one of the Service Replay Providers—FullStory—through a Service Replay Code—FullStory Script—after adding a "Movado BOLD Chronograph, 42 mm" to a wish list on www.bloomingdales.com.*

78.    The wiretapping conducted via the secretly-embedded Session Replay Code is ongoing during users' website visits, and both record data (the "when" and "where" data) and contents (the "what" data) of the Website Communications between Plaintiff and Bloomingdale's are intercepted with instantaneous transmissions to the Session Replay Providers.

79.    As illustrated below, it took only 61 milliseconds for a packet of event response data, indicating whatever actions the website user had just taken, to be shared with the Session Replay Provider:

80.    The Session Replay Code operates in the same manner for all putative Class Members.

81.    Like Plaintiff, each Class Member visited www.bloomingdales.com with Session Replay Code embedded on it, and that Session Replay Code intercepted each Class Members' Website Communications with www.bloomingdales.com by sending hyper-frequent logs of those communications – both record and content – to Session Replay Providers. This happens without any attempt to inform Plaintiff or Class Members of even the presence of a third party taking their information from them.

82.    Even if Bloomingdale's masked certain elements when it configured the settings of the Session Replay Code embedded on its website, any operational iteration of the Session Replay Code will, by its very nature and purpose, intercept the contents of communications between the website's visitors and the website owner.

83.     For example, even with heightened masking enabled, Session Replay Providers still learn through the intercepted data exactly which pages a user navigates to, how the user moves through the page (such as which areas the user zooms in on or interacted with), the nature and content of any searches conducted by the user, and additional substantive information.

84.     The Session Replay Code procured by Bloomingdale's is an electronic, mechanical, or other analogous device in that the Session Replay Code monitors, collects, and records the content of electronic computer-to-computer communications between Plaintiff's computer and/or mobile device and the computer servers and hardware utilized by Bloomingdale's to operate its website.

85.     Additionally, the Session Replay Code is software designed to alter the operation of a website visitor's computer or mobile phone by instructing the hardware components of that physical device to run the processes that ultimately intercept the visitor's communications and transmit them to the third-party Session Replay Provider, without the visitor's knowledge.

86.     As a specific example, when a user types a product into Bloomingdale's main search bar and initiates a search, even if the text entered into the search bar is masked, Session Replay Providers still capture the search bar entries as soon as the search result page loads. This is so because the responsive search results will be displayed on the subsequent page, and the responsive content generated by Bloomingdale's will repeat the searched information back on the generated page. That information will not be masked even if user-inputted text is fully masked in a text field.

87.     Session Replay Code intercepts the Website Communications of website users by directing that all such communications are sent to the Session Replay Provider as well as the website owner. This "co-transmission" occurs throughout the user's visit to www.bloomingdales.com, all without the knowledge

or consent of the website user. The website users, here Plaintiff and Class Members, only intended their communications to be received by Bloomingdale's.

**F.**     **Plaintiff and Class Members Did Not Consent to the Interception of Their Website Communications.**

88.     Plaintiff and Class Members did not provide prior consent to Bloomingdale's interception of their Website Communications either directly or through the use of a Session Replay Provider, nor could they, as the interception begins *immediately* upon arriving at www.bloomingdales.com.

89.     As a 2017 study recognized, the extent of data collected by Session Replay Code "far exceeds user expectations []; text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user."[50]

90.     Bloomingdale's does not ask website visitors, including Plaintiff and Class Members, for consent before wiretapping (directly or through a Session Replay Provider) their Website Communications. Indeed, Plaintiff and Class Members have no knowledge upon arriving at the website that Bloomingdale's is using Session Replay Code, provided by an unknown and unidentified third party, to secretly monitor, collect, and record their Website Communications, because the Session Replay Code is seamlessly incorporated and embedded into the Bloomingdale's website.

91.     While Bloomingdale's purports to maintain a "Privacy Policy," that policy is insufficient for Plaintiff and Class Members to furnish prior consent. First, because the wiretapping begins the moment a website user visits www.bloomingdales.com, Plaintiff and Class Members do not have the opportunity to review any purported privacy policy before being wiretapped and therefore can

---

[50] Englehardt, *supra* note 29.

only provide insufficient and subsequent consent (even if the Privacy Policy informed them of these activities, which it does not) once the wiretapping has already occurred.

92.    A reasonable person would not be on notice of the terms of Bloomingdale's Privacy Policy by way of normal interaction with the website. Bloomingdale's Privacy Policy is contained on the homepage of www.bloomingdales.com, buried at the very bottom of the website in tiny, non-contrasting font that is unobtrusive and easy to overlook.[51] As such, a reasonable person could browse the Bloomingdale's website without ever being on notice of the website's purported Privacy Policy.

93.    Additionally, because Bloomingdale's does not inform visitors that a third party is present and actively capturing every movement made by a website visitor during the course of their visit, including sensitive data entered by a website visitor during the course of their visit, or that the website visitor's data is being recorded, stored, shared, and potentially sold by the unknown third party, its policy (even if it was prominently displayed) is completely ineffective.

94.    A reasonable person would not be on notice that Session Replay Providers are able to track users across websites, a practice referred to as "fingerprinting," allowing the Session Replay Providers to identify and track the user's internet use beyond the Bloomingdale's website.

## CLASS ACTION ALLEGATIONS

95.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in California whose Website Communications were captured through the use of Session Replay Code embedded in www.bloomingdales.com.

---

[51] Bloomingdale's, *Home Page*, https://www.bloomingdales.com/ (last visited Feb. 6, 2024).

96.    Excluded from the Class are Bloomingdale's, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

97.    **Numerosity:** The members of the Class are so numerous that individual joinder of all Class Members is impracticable. The precise number of Class Members and their identities may be obtained from the books and records of Bloomingdale's or its Session Replay Providers.

98.    **Commonality:** This action involves questions of law and fact that are common to Class Members. Such common questions include, but are not limited to: (a) whether Bloomingdale's procures Session Replay Providers to intercept its website visitors' Website Communications; (b) whether Bloomingdale's intentionally discloses the intercepted Website Communications of their website users and/or permits the intercepted Website Communications to be disclosed; (c) whether Bloomingdale's acquires the contents of website users' Website Communications without their consent; (d) whether Bloomingdale's conduct violates the California Invasion of Privacy Act, Cal. Penal Code §630 *et seq.* and/or whether it constitutes a tortious invasion of privacy and/or intrusion on seclusion; (e) whether Plaintiff and Class Members are entitled to equitable relief; and (f) whether Plaintiff and the Class Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

99.    **Typicality:** Plaintiff's claims are typical of the other Class Members' claims because, among other things, all Class Members are comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Class had their communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that

underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

100. **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor her counsel have any interests adverse to the interests of the other members of the Class.

101. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

102. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant intercepted Plaintiff's and Class Members' Website Communications, then Plaintiff and each Class Member suffered damages by that conduct.

103.  **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through both Bloomingdale's books and records and its Session Replay Providers' books and records.

## COUNT I

## VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT

### Cal. Penal Code § 630 et. seq.

104.  Plaintiff incorporates the above allegations in paragraphs 1 through 103 as if fully set forth herein and brings this count individually and on behalf of the Class.

105.  The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630-638. The Act contains the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

106.  California Penal Code § 631(a) accordingly provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner ... willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

107. At all relevant times, Bloomingdale's business practice of procuring and embedding Session Replay Code on its website allowed Bloomingdale's and its Session Replay Provider(s) to access, intercept, learn the contents of, and collect Plaintiff's and Class Members' personally identifiable information and other sensitive data.

108. Plaintiff, and each Class Member, visited and/or interacted with the Bloomingdale's website in California.

109. Plaintiff and Class Members did not consent to Bloomingdale's actions in procuring and embedding Session Replay Code and intercepting, reading, and learning the contents of their communications.

110. Bloomingdale's conduct was intentional in that Bloomingdale's purposefully procured and embedded code which allows Bloomingdale's and its Session Replay Provider(s) to eavesdrop and learn the content of its website users' communications and other browsing activities that would otherwise be unavailable to Bloomingdale's without engaging in this practice. Bloomingdale's directly participated in the interception, reading, and/or learning of the contents of the communications between Plaintiff, Class Members, and California-based web entities.

111. Additionally, Bloomingdale's wrongfully, negligently and/or intentionally, aided, abetted, conspired with and/or employed Session Replay Providers, including but not limited to FullStory, to unlawfully, and without the consent of all parties, record, read and/or otherwise gain access to the contents of the electronic communication(s) of Plaintiff and Class Members and/or otherwise violate California law, including California Penal Code § 631(a).

112. The information Bloomingdale's intercepts, or aids Session Replay Providers in intercepting, while Plaintiff and Class Members are using the Bloomingdale's website includes personally identifiable information and other

highly specific information and communications, including, without limitation, every button, keystroke and link a user taps, whether the user has taken any screenshots, text entries (including passwords and payment card information), the duration of time a user browsed the website, what products were viewed and/or searched for, and other "what" data (i.e., content) of the communications.

113.    Plaintiff and Class Members have suffered loss by reason of these violations, including but not limited to, violation of their rights to privacy.

114.    As a result of the above violations and pursuant to CIPA section 637.2, Bloomingdale's is liable to Plaintiff and Class Members for the greater of treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2(c) provides "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

115.    Plaintiff further requests, as provided under CIPA, reasonable attorneys' fees and costs of suit, declaratory relief, and punitive damages in an amount to be determined by a jury sufficient to prevent or deter the same or similar conduct by Bloomingdale's.

## <u>COUNT II</u>

### **Invasion of Privacy – Intrusion Upon Seclusion**

116.    Plaintiff incorporates the above allegations in paragraphs 1 through 103 as if fully set forth herein and brings this count individually and on behalf of the Class.

117.    California law recognizes the tort of invasion of privacy/intrusion on seclusion.

118.    Plaintiff and Class Members have an objective, reasonable expectation of privacy in their Website Communications. By way of example, Plaintiff and Class Members had no reason to know that the fact of or the content of their Website

Communications would be intercepted by and/or provided to third parties, including Session Replay Providers.

119.   Further, Plaintiff and Class Members had no reason to know that Bloomingdale's and/or its Session Replay Providers were creating "fingerprints" which, once associated with an individual, allowed the tracking of Plaintiff's and Class Members' internet use across multiple websites, including but not limited to www.bloomingdales.com. On information and belief, once a "fingerprint" is associated with an individual, this tracking continues across any website utilizing Session Replay Code, even when the user stops visiting www.bloomingdales.com.

120.   Plaintiff and Class Members did not consent to, authorize, or know about Bloomingdale's invasion/intrusion at the time it occurred. Plaintiff and Class Members never agreed that Bloomingdale's or its undisclosed Session Replay Providers could collect or disclose their Website Communications.

121.   Plaintiff and Class Members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain. For example, Plaintiff and Class Members had a reasonable expectation that their communications with Bloomingdale's would not also be immediately disclosed, in full detail, to undisclosed third-party Session Replay Providers.

122.   Bloomingdale's, through the undisclosed and nonconsensual presence of Session Replay Providers, collects, captures, disseminates, and profits from any activities conducted by Plaintiff and Class Members while visiting bloomingdales.com, thereby intentionally intruding on Plaintiff's and Class Members' private lives, seclusion, and solitude, without consent.

123.    Bloomingdale's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

124.    Plaintiff and Class Members were harmed by Bloomingdale's wrongful conduct as Bloomingdale's conduct caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

125.    Bloomingdale's conduct needlessly harmed Plaintiff and the Class by allowing undisclosed third-party Session Replay Providers to capture personal facts and data in the form of their Website Communications, including, without limitation, personally identifiable information, payment card information, and other sensitive data entered into text and/or search fields on the Bloomingdale's website. This nonconsensual disclosure and loss of privacy and confidentiality caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

126.    Additionally, given the monetary value of individual personal information, and the potential for Bloomingdale's and its third-party Session Replay Providers to profit from the use or sale of such information, Bloomingdale's deprived Plaintiff and Class Members of the economic value of their interactions, and the valuable Private Information contained in the recorded replays of those interactions, with the Bloomingdale's website, without providing proper consideration for Plaintiff's and Class Members' property.

127.    Further, Bloomingdale's improperly profited from its invasion of Plaintiff's and Class Members' privacy by using the collected data for its own use and business purposes.

128.   As a direct and proximate result of Bloomingdale's conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

129.   Bloomingdale's conduct is ongoing, and Bloomingdale's continues to unlawfully intercept, and to permit the nonconsensual presence of and interception by Session Replay Providers, of the communications of Plaintiff and Class Members any time they visit the Bloomingdale's website with Session Replay Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory relief to prevent future interceptions of their communications.

## **REQUEST FOR RELIEF**

Plaintiff, individually and on behalf of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and the Class's favor and against Defendant as follows:

A.   Certifying the Class and appointing Plaintiff as the Class representative;

B.   Appointing Plaintiff's counsel as Class counsel;

C.   Declaring that Defendant's past conduct was unlawful, as alleged herein;

D.   Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E.   Awarding equitable relief as the Court deems just and proper;

F.   Awarding Plaintiff and the Class statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.   Awarding Plaintiff and the Class pre-judgment and post-judgment interest;

H.   Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses; and

I.      Granting such other relief as the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

Dated: February 9, 2024                    Respectfully Submitted,

*/s/ Steven M. Nathan*
Steven M. Nathan, SBN 153250
**HAUSFELD LLP**
33 Whitehall Street
Fourteenth Floor
New York, NY 10004
Telephone: (646) 357-1100
Email: snathan@hausfeld.com

James J. Pizzirusso, DC No. 477604*
**HAUSFELD LLP**
888 16th Street N.W.
Suite 300
Washington, D.C. 20006
Telephone: (202) 540-7200
Email: jpizzirusso@hausfeld.com

Stephen B. Murray, La. No. 9858
Stephen B. Murray, Jr, La. No. 23877
Arthur M. Murray, La. No. 27694
Thomas M. Beh, La. No. 24018*
**THE MURRAY LAW FIRM**
701 Poydras Street, Suite 4250
New Orleans, Louisiana 70139
Telephone: (504) 525-8100
Telecopier: (504) 584-5249
Email: Tbeh@Murray-lawfirm.com

*Counsel for Plaintiff*

***Pro Hac Vice Admission***